NUMBER 13-98-149-CR



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI


__________________________________________________________________


LEONARD MILLER, Appellant,


v.



THE STATE OF TEXAS, Appellee.

__________________________________________________________________


On appeal from the 130th District Court


of Matagorda County, Texas.


__________________________________________________________________


O P I N I O N



Before Chief Justice Seerden and Justices Yañez and Chavez



Opinion by Justice Yañez





 This case is an appeal from a conviction for driving while
intoxicated.(1) Appellant, Leonard Miller, raises five points of error to
challenge his conviction. We reverse and remand for a new trial.

 On February 20, 1996, Leonard Miller was arrested for driving
while intoxicated. Miller was stopped by Matagorda County Deputy
Sheriff Allen Dickerson after Dickerson saw Miller cross both the stripe
marking the center of the road and the white stripe marking the
shoulder of the road. Dickerson testified he noticed that Miller smelled
of alcohol and appeared to be intoxicated. Dickerson administered a
horizontal nystagmus test (HGN), and then requested that Miller
perform two other field sobriety tests.(2)
 Miller did not attempt these
other sobriety tests, saying he was unable to perform them because of
a medical condition. Based on his performance on the HGN test and
Miller's overall conduct, Dickerson arrested him for driving while
intoxicated. Miller was taken to the Matagorda County Sheriff's
Department. At the sheriff's office, Miller was videotaped while being
interviewed by Officer PeVey of the Texas Department of Public Safety
(DPS). Officer PeVey read Miller his Miranda rights, asked him to state
his address, perform sobriety tests, and answer some questions. Miller
refused to perform the sobriety tests and refused to answer questions. 
PeVey then read Miller the information required under section 724.015
of the Texas Transportation Code and requested a sample of Miller's
breath for testing for alcohol concentration.(3) Miller refused to give a
breath sample and the interview was concluded. Miller was ultimately
tried and found guilty of driving while intoxicated by a jury. The jury
found Miller to be a repeat offender and assessed a punishment of
imprisonment in the Texas Department of Criminal Justice, Institutional
Division, for eighteen years and a fine of $10,000. Miller challenges his
conviction in five points of error.

 In his first point of error, Miller argues that Dickerson did not have
sufficient probable cause for the initial traffic stop and therefore the trial
court should have suppressed all the evidence obtained as a result of
the stop. The trial court held a pre-trial hearing to determine if
Dickerson had probable cause. At the hearing, and again at trial,
Dickerson testified that Miller crossed both the center stripe and the
shoulder stripe in less than a mile of travel. Crossing the shoulder
stripe does not constitute a violation of state law, absent a showing
that such a maneuver is unsafe, however, crossing the center stripe is
a violation of the transportation code. Tex. Transp. Code Ann. §§
545.060, 545.051 (Vernon 1999); Texas Dept. of Public Safety v.
Chang, 994 S.W.2d 875, 878 (Tex. App.--Austin 1999, no pet.). An
officer may initiate a traffic stop for a traffic violation. McVickers v.
State, 874 S.W.2d 662, 664 (Tex. Crim. App. 1993)(en banc). 
Dickerson legally stopped Miller because he saw Miller violate a traffic
law. The trial court did not err in refusing to suppress the evidence
which resulted from the stop. Point of error number one is overruled.

 Appellant's second and third points of error concern the admission
at trial of the audio portion of the videotape made at the sheriff's
department when Miller was placed under arrest. Miller filed a pretrial
motion to suppress the audio portion of the videotape. This motion was
denied. At trial, Miller objected to the admission of the audio portion of
the videotape when the State published the videotape to the jury. 
Miller's objection was overruled.

 A videotape of a suspect performing sobriety tests or engaging in
non-testimonial conduct is admissible at trial. Miffleton v. State, 777
S.W.2d 76, 81 (Tex. Crim. App. 1989)(en banc). However, the audio
portion of a video should be suppressed when it implicates a suspect's
invocation of his constitutional rights. Hardie v. State, 807 S.W.2d 319,
322 (Tex. Crim. App. 1991); Sontag v. State, 841 S.W.2d 889, 893 (Tex.
App.--Corpus Christi 1992, pet. ref'd). Admitting the audio portion of
a videotape wherein a suspect invokes his right to refuse to answer
questions is constitutional error. See Gray v. State, 986 S.W.2d 814,
815 (Tex. App.--Beaumont 1999, no pet.)(finding constitutional error in
admission of audio portion of videotape where suspect invoked right to
counsel and right to terminate interview).

 In the instant case, the tape shows DPS officer PeVey reading
Miller his Miranda rights, with Miller stating that he understands his
rights. PeVey asks Miller for his address, which Miller recites. After
Miller refuses to perform any sobriety tests, the officer asks if Miller will
answer some questions, to which Miller replies, "No." Officer PeVey
then reads Miller a statement advising him that because he has been
arrested for driving while intoxicated, he will be requested to give a
specimen of his breath for analysis, and if he refuses, his driving license
can be suspended and his refusal will be admissible in a subsequent
prosecution. The officer also provides Miller with a written copy of the
warning. Miller refuses to give a sample, although he states that he
will allow his physician to take a blood sample. The officer tells Miller
that he may call his physician. The tape ends with Miller refusing to
sign the written copy of the warning.

 Miller argues that the audio portion of the tape includes a
testimonial statement on his part. We agree that Miller's refusal to
answer any questions constituted an invocation of his Fifth Amendment
right against self-incrimination and should have been suppressed. 
Dumas v. State, 812 S.W.2d 611, 614 (Tex. App.--Dallas 1991, pet.
ref'd). The remaining audio is admissible.(4) The trial court erred in
admitting the audio of the officer asking Miller to answer questions and
Miller refusing. Id.

 Although this is a constitutional error, it is not the kind of
structural constitutional error that requires automatic reversal. Arizona
v. Fulminante, 499 U.S. 279, 311 (1991)(citing United States v. Hasting,
461 U.S. 499 (1983). Constitutional errors which are not structural are
analyzed under the harmless error standard enunciated in Texas Rule
of Appellate Procedure 44.2. Heard v. State, 995 S.W.2d 317, 321 (Tex.
App.--Corpus Christi 1999, pet. ref'd). We must reverse unless we
determine "beyond a reasonable doubt that the error did not contribute
to the conviction or punishment." Tex. R. App. P. 44.2(a). When an
appellate court analyzes constitutional error, the court:

should examine the source of the error, the nature of the
error, whether or to what extent it was emphasized by the
State, and its probable collateral implications. Further the
court should consider how much weight a juror would
probably place upon the error. In addition the Court [sic]
must also determine whether declaring the error harmless
would encourage the State to repeat it with impunity. In
summary the reviewing court should focus not on the
weight of the other evidence of guilt, but rather on whether
the error at issue might possibly have prejudiced the jurors'
decision-making; it should ask not whether the jury reached
the correct result, but rather whether the jurors were able to
properly apply law to facts in order to reach a verdict.


Harris v. State, 790 S.W.2d 568, 587-88 (Tex. Crim. App. 1989). When
a court rules that the error is harmless, it is essentially ruling that the
evidence of guilt is so overwhelming that the error did not contribute to
the verdict. Id. at 587. 

 In the instant case, the State repeatedly emphasized Miller's
refusal to answer questions. The following exchange occurred during
the State's redirect examination of Dickerson:Q. The questions that [defense counsel] went through in
regards to - - did you ask him if he had been injured
lately? Did you ask him if he was under a doctor's
care? Are you familiar with those questions?


A. Yes, sir, they're part of a D.W.I. paperwork that you do,
called the TELA.


Q. Are they questions that you intend to ask a D.W.I. as a
suspect at some point?


A. Yes, sir, that's part of the paperwork in a D.W.I. You
ask the subject the same question she was asking me. 
The subject refused to sign any paper - -


 [DEFENSE COUNSEL]: Objection, your Honor.


 THE COURT: Overruled. You may
answer.


BY [THE STATE]:


Q. You may answer.


A. The subject refused to sign any paperwork and refused
to answer any questions.


Q. Was there an attempt by you or another officer to ask
those questions of the defendant?


A. It was attempted by [DPS officer PeVey].


Q. If somebody refuses to answer those questions, can
you force them to?


A. No, sir.


Q. If the jury had that information today and you had that
information on that night, it may assist the jury in its
determination?


A. Yes, sir.


Q. But the only place that information could come from,
the answers to those questions, would come from the
defendant?


A. Yes, sir.


The only time that PeVey questioned Miller was during the videotaped
interview. Dickerson's answers to the State's questions about any
other officer attempting to ask Miller questions are clear references to
Miller's refusal on the videotape. The State again emphasized Miller's
refusal to answer the DPS officer's questions during the State's direct
examination of Officer PeVey, following the viewing of the videotape. 

Q. And you also intend to ask them some questions if he's
willing to answer them?


A. That's correct.


Q. Is one of those questions that you would ask him
whether or not he had been drinking?


A. Yes, it is.


Q. And was one of those questions would have been [sic]
whether or not he was under doctor's care?


A. That's correct.


Q. Would you have asked him when he had his last drink?


A. We would have asked him that, yes, sir.


 The State again raised Miller's refusal to answer PeVey's
questions in its closing argument, stating: "Trooper PeVey came in, and
he had very limited exposure to the defendant. The reason why - - you
saw in the video - - is that he refused to answer any questions." 

 The videotape is slightly over four minutes long. Miller does
appear to slightly sway, occasionally, but walks without any obvious
difficulty. During deliberations, the jury requested to see the videotape
again, with a note from the presiding juror stating: "Many of us could
not hear it." The State not only emphasized Miller's refusal to answer
PeVey's questions, but further showed that the questions would have
included exactly the kind of interrogation that a suspect cannot be
compelled to answer. See Miffleton, 777 S.W.2d at 81-82 (interrogation
includes questioning or actions on the part of the police that are likely
to elicit an incriminating response from the suspect). The State
essentially demonstrated that Miller was refusing to answer questions
which could have required self-incriminating answers.

 Along with the videotape, the State introduced Dickerson's
testimony that Miller was unsteady on his feet when he exited his car,
and appeared to lean on his car to keep his balance. Dickerson further
testified that Miller performed poorly on the HGN test and smelled of
alcohol. The State introduced testimony by PeVey that Miller smelled
of alcohol and swayed while he stood in the video room. PeVey also
testified that Miller walked slowly and deliberately, as though
"preplanning every step."

 The defense cross-examined both Dickerson and PeVey. On cross-examination, Dickerson described Miller's location in relation to his
police car when performing the HGN test. Dickerson discussed the
lights he had activated on his car at the scene of the traffic stop, which
could have affected Miller's performance on the HGN test. Dickerson
admitted that, under laboratory conditions, the HGN test is reliable
seventy-seven percent of the time. The defense also called an
acquaintance of Miller, who testified to having seen Miller earlier in
evening, before his arrest. This witness stated Miller did not appear
intoxicated to her when she saw him, although it is unclear how much
time elapsed between her meeting Miller and the arrest.

 After reviewing the record, we cannot conclude beyond a
reasonable doubt that the erroneous admission of Miller's refusal to
answer questions while being videotaped did not contribute to the
verdict in this case. The State doggedly brought to the jury's attention
the fact that Miller refused to answer questions, explicitly raising
potential questions which would have directly implicated Miller's Fifth
Amendment rights. The jury requested that they be allowed to watch
the videotape again, specifically stating that some of the jurors had
been unable to hear when the videotape was originally shown. The
jury's desire to hear the tape is especially important considering the
emphasis the State placed on Miller's refusal to answer questions
during the videotape. 

 Although the testimony from Dickerson and PeVey could support
a verdict of guilty, the evidence is not so overwhelming as to lead us to
believe, beyond a reasonable doubt, that the erroneous admission of
Miller's refusal to answer PeVey's questions, especially considering the
State's underscoring that refusal, did not contribute to the verdict. The
jury could have easily been led to consider Miller's refusal in deciding
the outcome of this case. We further note that declaring this error
harmless would encourage the State to repeat this error. Harris, 790
S.W.2d at 587. 

 Miller's second and third points of error are sustained. Because
these points of error are dispositive, we do not consider Miller's fourth
and fifth points of error. Tex. R. App. P. 47.1. 

 We REVERSE and REMAND for new trial.


 ____________________________ LINDA REYNA YAÑEZ

 Justice


Do not publish.

Tex. R. App. P. 47.3.


Opinion delivered and filed this

the 20th day of July, 2000.


1. See Tex. Pen Code Ann. § 49.04
2. The HGN test involves observing the reactions of the subject as
an object is moved horizontally across the subject's line of sight. 
Alcoholic intoxication interferes with a person's ability to follow the
movement of the object smoothly, causing the eyes to jerk as they
move.

3. Before requesting a blood, urine, or breath specimen from a
suspect for testing for alcohol, an officer must advise the suspect of
the legal ramifications of refusing to give a sample, which include the
suspension of the suspect's driving license and the use of that
refusal in subsequent prosecutions. Tex. Transp. Code § 724.015
(Vernon 1999).
4. Miller's refusal to provide a sample of his breath is admissible. 
Tex. Transp. Code Ann. § 724.015 (Vernon 1999); Thomas v. State,
723 S.W.2d 696, 704-705 (Tex. Crim. App.--1986)(citing South
Dakota v. Neville, 459 U.S. 553, 563 (1983). Millers's refusal to
perform sobriety tests on the videotape is also admissible. Barraza v.
State, 733 S.W.2d 379, 381 (Tex. App.--Corpus Christi 1987), aff'd
on other grounds, 790 S.W.2d 654 (Tex. Crim. App. 1990).